No. 24.—JONES M. MAHONE, administrator, &c. plaintiff in error, *vs.* THE CENTRAL BANK OF GEORGIA, defendant in error.   THE CENTRAL BANK, plaintiff in error, *vs.* J. M. MAHONE, administrator, &c.

[1.] The Act of 1847, "to compel discoveries at Common Law," makes express provision, that nothing in that Act contained, shall preclude any party from exhibiting his bill in Chancery, for discovery touching the same matters."

[2.] Where a bill in Equity was filed, alleging that a bill of exchange, drawn by H, with the names of R and E indorsed thereon, the name of the acceptor being left in blank, was handed to M, and an understanding was had that the bill was to be accepted and then discounted for the benefit of R and E; and thereupon, M indorsed the same after R and E; but subsequently, the name of R was erased and removed from its position on the back of the bill, and inserted as acceptor; and this, as the bill alleged, was done with the consent and privity of the bank which discounted said bill, and was suing M on the same at Common Law: *Held*, that this was an alteration of said instrument to the injury of M, by lessening the security which he had the right to suppose, when he indorsed the bill, was interposed between him and payment, and that the bank might be perpetually enjoined in the prosecution of its action against M, upon proof of these facts: *Held*, also, that upon the coming in of the answer by the bank, swearing off the equity, by denying its knowledge of or privity with the transaction, that the injunction should be dissolved, to await the hearing.

[3.] The Statute of Limitations does not run against debts due to the Central Bank.   Not because the State is the owner of its assets, nor because it has transferred any portion of its sovereignty to the bank; but because it has made this provision by express legislation.

[4.] The Statute of 1792, which regulates the order in which debts due by a testator or intestate are to be paid, includes and refers to "debts due the public :" *Held*, consequently, that a debt due the Central Bank is within the terms of this Statute, whether it be a debt due the public, or upon the footing of a debt due to a private person.

[5.] Demand, notice, protest, &c. are not necessary to charge an indorser in a suit against him, upon a note or bill due to the Central Bank.

[6.] A Court of Equity will not apply an equitable bar for the benefit of an indorser, on a bill of exchange due the Central Bank, because that no action was brought upon the same in eleven years, and of the loss of his rights on prior parties to the bill by death or removal, where it does not appear that that indorser has taken any steps such as the law authorizes, or exercised any diligence to protect himself from the loss or lessening of the security of those who preceded him on the bill.

[7.] The general principle is correct, that where an amendment makes a new case in Equity, and until it is answered, the defendant is not in order to move a dissolution of the injunction : *Aliter*, where the amendment presents no new case, and the equities remain the same.

In Equity, in Talbot Superior Court.   Decisions by Judge CRAWFORD, at September Term, 1854.

The Central Bank of Georgia brought suit against Jones M. Mahone, as administrator of Peter F. Mahone, as indorser on the following draft:

MILLEDGEVILLE, APRIL 5, 1836.

$2500$\frac{00}{100}$

Four months after date, pay to the order of Whitnel Eason, at either of the banks in Augusta, Twenty-five Hundred Dollars, for value received, and charge the same to account of

WILLIAM S. HARP.

To SAMUEL ROWE, Augusta.

Accepted.                      SAMUEL ROWE.

Indorsed—

SAMUEL ROWE. (Erased.)

Pay to Peter F. Mahone.

WHITNEL EASON.

Pay Wilkins Hunt.

P. F. MAHONE.

Pay Central Bank of Georgia.

WILKINS HUNT.

There was a verdict for plaintiff, and an appeal.   On the appeal, Mahone filed his bill in Equity, praying an injunction, charging that this draft was really for the benefit of Rowe and Eason ; that Mahone was a mere accommodation indorser, and that at the time  he indorsed, Samuel Roe's name as prior indorser, had not been erased; that the same was subsequently erased from the note, with the consent of the Central Bank; that in 1841, the Central Bank brought suit on the note, and

a plea of *non est factum*, on the ground above stated, was filed by Mahone, then in life, and that on the appeal, after the cause was submitted to the Jury, the presiding Judge having charged that the failure to protest and give notice to the indorsers discharged them, the Central Bank voluntarily submitted to a non-suit; that the fact was, that no such notice was given; and until the Supreme Court held otherwise, this was held, by the Superior Court, to be fatal to the claim of the bank; that.the bank had been guilty of great *laches* in not suing the maker and prior indorsers; that since the present suit was brought the complainant had given the bank notice to sue the drawer and prior indorsers, which they had failed to do in three months.    The bill farther charged, that at the time said suit was first brought, Eason's estate was not fully administered, and was abundantly able to pay said debt; that complainant, as administrator of P. F. Mahone, had never received any notice of this debt, and had fully administered and distributed the estate, except about $780, still in his hands.    The distributees of the estate were made parties defendant, and a prayer was made, that if paid at all, they should be decreed to pay it according to the amount received by them.

The bill prayed a perpetual injunction against the bank, of the suit progressing on the draft : and discovery and relief.

The answer of the bank was made in the name of the Central Bank, and was sworn to by the treasurer and *ex officio* director, in the following form :

GEORGIA—BALDWIN COUNTY:

Personally appeared before me, John B. Trippe, Treasurer and Director of the Central Bank, who being sworn, says— "that the answer in the foregoing pages, so far as they rest in his own knowledge, are true; and so far as he derives them from information, he believes them to be true."

Complainant's Counsel moved to take the answer off the file—

114     SUPREME COURT OF GEORGIA.

Mahone, adm'r, &c. vs. The Central Bank.

1st. Because it was not made under the seal of the bank.

2d. The affidavit was not in compliance with the 11th rule for Equity Practice.

3d. Because it was not signed by Counsel.

4th. Because the treasurer was not authorized to make answer for the bank.

The Court over-ruled the motion, and this is assigned as error.

The answer stated that the bank was ignorant of the circumstances under which P. F. Mahone indorsed the draft, but denied all knowledge or belief that Rowe's name was indorsed thereon, when Mahone signed his, or that it was stricken out without his knowledge or consent. The answer denied that the name of Rowe was stricken out with the knowledge and assent of the bank, or while the bank was owner of the bill. It admitted the suit in 1841, and that the case progressed and terminated in a *non-suit*. It admitted the notice to sue, and that the bank had not sued, because the parties were either removed from the State or dead, and their estates unrepresented when the notice was given. It admitted that notice was not given to the administrator of Mahone, of the claim against the estate.

Complainant's Counsel excepted to this answer as insufficient—

1st. As to the erasure of the name of Samuel Rowe.

2d. As to the allegation, that the estate of Eason was sufficient to pay said debt, if the bank had prosecuted it.

3d. As to the suit in 1841, and its abandonment by the bank.

4th. As to the complainant's giving notice to creditors, and distributing the estate before notice of this claim.

The Court over-ruled the exceptions, and this is assigned as error.

Defendant's Counsel then moved the Court to dissolve the injunction, on the ground that the equity was sworn off by the answer. The Court sustained the motion, and this decision is assigned as error.

Defendant's Counsel also moved to dismiss the bill for want of equity. This motion was refused, and the Central Bank assigned this decision as error. The two writs of error were consolidated in the Supreme Court, and heard together.

Jas. Johnson, for the Central Bank.

B. Hill and S. Jones, for Mahone.

*By the Court.*—Starnes, J. delivering the opinion.

[1.] This bill asks the interposition of a Court of Equity, for purposes of discovery; and it is insisted before us, that such discovery, by answer in Chancery, is not needed and should not be granted, because, by the Act of 1847, the defendant might have taken the answers of the bank or its officer, in the Common Law case, by interrogatories.

The Act of 1847 mentioned, makes express provision that nothing in that Act contained "shall preclude any party from exhibiting his bill in Chancery, for discovery, touching the same matters." So that the complainant's right to a discovery in Equity, is in no wise lessened by the Act of 1847.

[2.] The chief relief peculiar to a Court of Equity, which is sought by this bill, is the grant of perpetual injunction.

For the defendant in that bill (the Central Bank) it is said—

1. That the defendant has an ample remedy, by defending the Common Law action against him, admitting that the case he makes in his bill is true, and that an injunction is not needed; that he does not pray to have the paper sued on delivered up to be cancelled, &c.

Waiving a consideration of the rule, that where a Court of Equity takes jurisdiction for discovery, it will entertain it for relief, we remark, that though it be true that the complainant might defend himself successfully against the Common Law action now pending against him, yet, under the circumstances set forth, this remedy cannot be said to be adequate and complete. There is nothing to prevent a dismissal of the petition,

if the views of the Court should be against the bank, as was done when action was brought upon the same instrument against complainant's intestate, and a renewal of it after the lapse of years. And from this the complainant, who is acting in the premises simply as a trustee, can be and ought to be protected, if the allegations of the bill be true, by a perpetual injunction, which will be precisely equivalent, in its effects, to a cancellation of the instrument, as to him.

It seems not to be denied, that if the draft has undergone an alteration or change, in fraud of the rights of complainant's intestate, a Court of Equity might decree that it should be delivered up to be cancelled. But it may be doubted whether or not that would be the proper course to be pursued with this instrument. Other parties to it are liable thereon to the bank, and have no such defence as that of the complainant. The better prayer for relief would seem to be, therefore, that which is preferred; and it amounts, in effect, to a prayer for cancellation, *quoad* the interests of the complainant's intestate in the instrument.

2. It is contended that sufficient foundation for such injunction has not been laid in the allegations of the bill. It is argued that the bill sets forth an erasure of the name of Samuel Rowe, as indorser, after the indorsement by Peter F. Mahone, but does not show that any injury resulted thereby to the latter, because it appears that the name of Rowe was transferred from the back of the paper, as indorser, to its face, as acceptor; and thus, the security of his property and credit was still interposed between Mahone and payment of the bill.

We are inclined, strongly, to think that when a bill of exchange is drawn by a person, the name of the acceptor being left in blank, and the same is handed to a third party, with an indorser upon it, and that third party is requested, as a matter of mere accommodation, to put his name after the indorser whose name is upon it, and does so, with the understanding that it is to be discounted in some bank, for the accommodation of the drawer and indorser, the legal intendment of such a transaction is, that the blank is to be filled by another per-

son as acceptor, and that when the paper is completed, there will be between the last indorser and payment, two persons interposed.

We think, at all events, that this bill, though not very skilfully framed, with reference to this allegation, when its whole structure is considered, sufficiently sets forth the fact, that such was the understanding of the indorser, Mahone, in this case; and that the erasure of the name of Rowe as a prior indorser, and the insertion thereof as acceptor, removed one of the securities, which he had the right to suppose when he indorsed the bill, would intervene between him and payment by him, and was in fraud of his rights.

The bill also alleges, in effect, that to such change the bank, though receiving such bill as a negotiable paper before it was due, was privy and consenting.   If this be so, Mahone had the right to plead, when sued upon this instrument by the bank, *non haec in foedera veni*, and his administrator is entitled to be protected against the suit upon the bill.

But an answer has been filed—the bank, by its officer, denies that it had anything, whatever, to do with this alteration in the bill, if it were made, and thus swearing off the equity of the bill, the injunction, so far as this point is concerned, has been properly dissolved, to await the hearing.

[3.] Another ground on which the Chancellor has been asked by the complainant, in this bill, to interpose by injunction is, that the action on this bill of exchange, is barred by the Statute of Limitations.    And to sustain this position, it is argued, that the doctrine of *nullum tempus occurrit reipublicae* does not apply to debts due the Central Bank.    This argument has been rested, first, upon the ground, that the phraseology of the latter part of the 11th section of the Act of 1829, amending the charter of the Central Bank, shows that the Legislature intended, by that Act, to vest in the corporation "the rights, powers, privileges or immunities reserved by law, or accruing to it, in virtue of its sovereign capacity, in regard to the collection of the bonds, notes, specialties, &c. due to it or to become due," only so far as the "bonds, notes, special-

ties, judgments," &c. originally transferred to the bank,
or the bonds, notes, &c. in renewal of them were concerned;
and did not design to vest these privileges in the corporation,
in regard to the collection of any other bonds, notes, &c.   For,
says the Counsel, the latter words of the section show that
these privileges, immunities, &c. are vested "in as full, per-
fect, absolute and unqualified a manner, as they could have
been used, enjoyed and exercised by the State, *had no such
transfer been made, or such bank been established.*"   And
now, says the ingenious Counsel, notes, bills, &c. discounted
from time to time by the bank, and not part of the assets
transferred to the bank, by the State, or in renewal thereof,
in the nature of things, could not have existence in as full and
perfect a manner, &c. *as though such bank had never been es-
tablished;* and the immunities claimed, being such as applied
to instruments which could be contemplated as existing, and
having those immunities attached as one of their incidents in
as full and perfect a manner as if such bank had never been
established, *ergo,* such a bill as that at bar not having been
transferred to the bank by the State, nor given in renewal of
one thus transferred, does not fall within the description of
those instruments to which these immunities attach.

But the argument proves too much for the case.   For if the
language specified will not apply to a note or bill having the
relation to the bank which this has, no more will it apply to
notes given in renewal of those originally transferred; for these
renewal notes cannot be considered as ever having existed in
as full, perfect and unqualified a manner as if such transfer
had never been made, or *such bank been established.*   Such re-
newal notes, indeed, cannot be thought of at all, except in con-
nection with the existence of the bank.   But the Statute ap-
plies to such renewal notes, in plain terms, and this the Coun-
sel admits.   The argument, therefore, is unsound.   The phra-
seology criticised, is not altogether accurate, but in the opin-
ion of the Court, the provisions of this section were intended
to apply alike to all evidences of debt owned by the bank.

In the next place, it was alleged that the Central Bank was

not authorized, by law, to avail itself of the doctrine of *nullum tempus, &c.* because this was an assertion of a sovereign prerogative, and the State cannot transfer or delegate its sovereignty.

We have no intention of discussing the right of a State to delegate its sovereignty, a question so ˹much and so loosely talked about, and perhaps so little understood; for we have no idea that this case rests upon a solution of it.

We do not put the right of the Central Bank, to have the debts due to it exempt from the operation of the Statute of Limitations, upon the ground, that the State has transferred to it any portion of its sovereignty. We look upon the twelfth section of the Act of 1829, as containing in the provision, that " in directing, by the second section of the Act establishing the bank, the transfer to it of all the bonds, notes, &c. due to the State, the General Assembly did not divest the State of any of its rights, powers, privileges or immunities, reserved by law, or accruing to it in virtue of its sovereign capacity, *in regard to the collection of the aforesaid bonds, &c. further than to vest the said rights, &c. in the said president and directors ;*" that which is equivalent simply to a legislative declaration, that the State had authorized the bank to avail itself of the doctrine of *nullum tempus, &c.*

It will be observed, that these privileges, &c. thus vested in the bank, are privileges *in regard to the collection* of debts due. What other immunity than its right to avail itself of the principle of *nullum tempus* could there be, " in regard to the collection" of these debts ? The immunity of not being sued, could not have been meant; for the State could not be sued for a debt due *to* it; nor could it have been intended that the bank should not be subject to any cross action, or off-set, where it had sued for the collection of a debt, for to such the State would be subject where it had already entered the jurisdiction of the Courts.

This view removes all difficulty growing out of the idea, that the State cannot delegate its sovereignty. This consideration, too, obviates any difficulty which might present itself in the

shape of an objection, that if these immunities were transferred to the bank, to be exercised as a portion of the sovereign prerogative of the State, and the bank is thus clothed with these attributes of sovereignty, its bills are or were in the nature of "bills of credit," and its organization is contrary to the Constitution of the United States.

According to this view, the bank, instead of possessing the attributes of sovereignty, has no more power than is given to it in the Act of incorporation, and precisely the same as if the stock were owned by private individuals. In which case, according to the Supreme Court of the United States, it is constitutional. *Briscoe vs. The Bank of Kentucky*, (11 *Pet.* 257.) And in this view, and on this account, its right to avail itself of the principle of *nullum tempus*, is not obnoxious to the objection suggested by the Supreme Court of Alabama, in the case of *Bank of Alabama vs. Gibson's Adm'rs.* (6 *Ala.* 814.)

There the right of a bank to this immunity, was put upon the ground that the State was the sole owner of the stock, and it was argued, that therefore, the State's sovereignty was transferred to the bank. Here, it is placed upon the basis of an express legislative provision, in the Act of incorporation, which, in effect, declares that time shall not run against the bank.

On this subject, one of the Court (our brother BENNING) desires us to say, that he *distrustingly* yields his opinion to the conclusion, that taking the whole of its legislation together, the State *has vested* the right in the Central Bank, to avail itself of·this privilege ; finding, as he does, certain features of that legislation, (especially the provision which authorizes the bank to sue and be sued,) which create some doubt in his mind. But that member of the Court has no difficulty as to the power of the Legislature to enact, that the Statute of Limitations shall not run against the Central Bank ; or arising out of the suggestion, that the bank can assert this privilege only by virtue of delegated sovereignty. He has only hesitated in saying that it *has done* it.

Our construction of this section then, is, that it is equivalent

to a legislative provision, that "in regard to the collection" of its debts, the Statutes of Limitations, in the State, shall not operate against the Central Bank.

[4.] We are next asked to decide, whether or not this indorser was discharged by failure of demand and notice, protest, &c. on the part of the bank?

We cannot agree with the Counsel for the complainant in this bill, and give to the 26th section of the charter, dispensing with notice, &c. the limited signification which he ascribes to it. We look upon this point as settled by the decisions of this Court, in *The Merchant's Bank of Macon vs. The Central Bank*, (1 *Kelly*, 431;) *and The Central Bank vs. Whitfield*, (*Ibid* 593;) and we are disposed to apply the maxim *stare decissis*, and to hold that such demand, notice, &c. were not necessary in this case.

[5.] Another and a very important point, is made by this bill, to the effect, that no notice of this debt was given to the administrator of Peter F. Mahone, until more than twelve months had elapsed from the grant of letters, and until he had distributed all of said estate, except the sum of $781.64, and that as a consequence, he is relieved from all liability, personally, for more than the sum just specified.

To this it was objected, that here again the doctrine of *nullum tempus* applies, this being a debt due the State.

It has been held, that a debt due to a banking corporation, although the State owns the whole interest of the bank, is not a debt due to the public. (*The Bank of South Carolina vs. Gibbs*, 3 *McC.* 377. *Briscoe vs. The Bank of Kentucky*, 11 *Pet.* 257.)

But it is unnecessary for us, now, to pronounce an opinion upon this point. If this debt is not a debt due to the public, it is of course included among the general provisions of the Act of 1792. If it be a debt due to the public, then, by express provision, the Legislature has included it among those which are to be rendered to the administrator within twelve months, according to the Act of 1792.

That Act, which regulates the order in which the debts due by a testator or intestate are to be paid, and which includes the aforesaid exemption, refers to "debts due the public," among others. And then, in the same context and paragraph declares, that "creditors neglecting to give in a state of their debts within the time aforesaid, the executors or administrators shall not be liable to make good the same," &c. It follows that the word creditors here applies to all those creditors to whose debts reference had been just made; and of course, the public or State among the rest.

It results, that a judgment *quando acciderint* only, must be taken against this administrator, (if the bank be, on other grounds, entitled to recover,) except as to the sum now in his hands.

[6.] We are of the opinion that the circumstances do not authorize the application of an equitable bar to this demand, in favor of the complainant, on account of lapse of time, "and from loss of his rights on prior parties," as his Counsel expresses it.

As indorsor, his intestate might have taken such steps as the law authorizes, to have secured himself against the loss or lessening of his security, by death or removal of those who preceded him in responsibility, on this paper. It does not appear that he has done so. And in the absence of any thing to show this, we hardly think the complainant can be protected, on the ground of the paramount equity suggested.

[7.] It was also insisted by the complainant, that the amendment filed in this case, *per se*, made a new case in Equity; and until it was answered, the defendant was not in order to move a dissolution of the injunction.

This general principle is correct enough. But here, so far as the defendant's rights are concerned, the amendment presents no new case, and the equities of the bill remain the same. Hence, the rule cited cannot be said to have any application to the case before us.

The motion to take the answer off the file, and the exceptions to

the sufficiency of that answer, were all, in our opinion, rightly over-ruled by the Court below, whose judgment we affirm.